UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
BUSINESS ASSET RELOCATION, INC.,

              Plaintiff,                      **MEMORANDUM AND ORDER**
                                                       14-CV-0098 (RRM) (VMS)
    - against -

TEAMSTERS LOCAL 814, A/W
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, AFL-CIO, an unincorporated
association; JASON IDE, individually and as
President of Teamsters Local 814; BUILDING
AND CONSTRUCTION TRADES COUNCIL
OF GREATER NEW YORK, an unincorporated
association; GARY LABARBERA, individually
and as President of Building and Construction
Trades Council of Greater New York; THE
TRUSTEES OF THE MASONIC HALL AND
ASYLUM FUND; and HAROLD WISSING,

              Defendants.
----------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

      Business Asset Relocation, Inc. ("BAR") is a moving company whose employees are represented by Local 1212, USWA ("Local 1212"). In mid-November of 2013, BAR arrived at 71 West 23rd Street in New York City to provide moving and storage services to AECOM Technology Corporation ("AECOM") in connection with its move out from that building. Upon its arrival, BAR was prohibited from entering the building, and Harold Wissing, the building manager, explained that the Building and Construction Trades Council of Greater New York ("BCTC") had instructed him not to allow BAR into the building. As BAR was unable to enter the building, AECOM eventually used a different company whose workers were represented by Local 814, IBT ("Local 814"), a member of the BCTC.

      BAR alleges that BCTC and Local 814 engaged in unfair labor practices under the

National Labor Relations Act ("NLRA") by unlawfully forcing AECOM to break its contract with BAR and assign the work instead to a moving company whose employees are represented by Local 814. BAR also alleges that Wissing and the building owner, The Trustees of the Masonic Hall and Asylum Fund ("Trustees") (together, the "Landlord Defendants"), committed tortious interference with its contract with AECOM. The defendants filed several motions to dismiss the claims.[1]

Because BAR sufficiently alleges that BCTC threatened Wissing with the twin goals of forcing AECOM to stop doing business with BAR and assigning the work instead to a Local 814-affiliated company, BCTC's motion to dismiss is granted in part (with respect to the section 8(b)(4)(A) claim) and denied in part (with respect to the section 8(b)(4)(B) and 8(b)(4)(D) claims) and. However, BAR fails to sufficiently allege that Local 814 engaged in unfair labor practices, and Local 814's motion to dismiss is therefore granted. Lastly, BAR fails to sufficiently allege that AECOM breached its contract with BAR, and the Landlord Defendants' motion to dismiss the claim of tortious interference with a contract is therefore granted.

## BACKGROUND[2]

A. <u>Factual Background</u>

BAR is a commercial moving and storage company that operates within the greater New York City area. (*See* Compl. (Doc. No. 1) at ¶ 7.) BAR employees are represented by Local 1212, (*see id.* at ¶ 17), while Local 814, another labor organization, represents employees of other moving and storage service employers, including several of BAR's competitors. (*See id.* at ¶¶ 9, 20.) Local 814 is a member of BCTC, a labor organization that maintains its principal

---

[1] Local 814 and Jason Ide, its president, jointly filed one motion to dismiss. (Doc. No. 31.) BCTC and Gary LaBarbera, its president, jointly filed a separate motion to dismiss. (Doc. No. 32.) And Wissing and the Trustees jointly filed a third motion to dismiss. (Doc. No. 33.)
[2] For purposes of this motion, the Court accepts as true all well-pled factual allegations in the complaint and draws all reasonable inferences in BAR's favor. *See Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

place of business at 71 West 23rd Street (the "Premises"). (*See id.* at ¶¶ 13, 22, 23.) BAR alleges that BCTC has openly supported Local 814's efforts to persuade individuals to stop doing business with its competitors,[3] and BCTC's president, defendant Gary LaBarbera, has publicly declared that Local 814 is the only moving and storage union it recognizes. (*See id.* at ¶¶ 22, 46.)

AECOM occupied the eleventh and twelfth floors of the Premises for several months in 2013. (*See id.* at ¶ 25.) On October 28, 2013, AECOM contracted with BAR to provide moving and storage services in connection with its move out of the building. (*See id.* at ¶¶ 26–27.) BAR alleges that the Trustees, who own the Premises and employ Wissing, knew about this contract. (*See id.* at ¶ 28.) On November 13 or 14, 2013, when BAR arrived at the Premises to begin its work, agents of the Trustees prohibited it from entering the building, saying that the Premises was a "union building," that BAR was "not the union," and that BCTC "owned" the building. (*Id.* at ¶¶ 31–32.)

BAR President Glenn Preslier then spoke with Wissing, who explained that the Trustees "would not provide elevator service" to BAR because BAR was not a member of the BCTC, and the Trustees feared that BCTC would take action against the Premises, including establishing a picket line that would make it impossible for the building to operate. (*See id.* at ¶ 34.) When Preslier told Wissing that BAR was "union," Wissing replied "not the right union, apparently." (*Id.* at ¶ 36.) He further explained that the problem was not with BAR, but instead with AECOM. (*See id.* at ¶ 39.) According to BAR, the "problem" Wissing had with AECOM was its contract with BAR, whose employees were represented by Local 1212, a competitor of Local 814. (*Id.* at ¶ 40.) As a result of Wissing's refusal to allow BAR to enter the building, AECOM

---

[3] BAR alleges that BCTC and Local 814 are associated with a movement titled "Moving Forward," which "engages in 'aggressive' campaigns to have building managers and business owners cease doing business with moving companies which are not affiliated with the BCTC." (Compl. at ¶ 46.)

3

reassigned some of the work initially contracted to BAR to a Local 814 affiliate. (*See id.* at ¶ 41.) On or about November 20, 2013, Preslier spoke with a principal of a Local 814 contractor, who told him that the contractor had encouraged Local 814 to pressure BCTC to take action to remove BAR from the job. (*See id.* at ¶ 43.)

B.  Procedural Background

In its complaint, BAR asserts three causes of action against Local 814 and BCTC, alleging unfair labor practices under section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, specifically under sections 8(b)(4)(A), 8(b)(4)(B), and 8(b)(4)(D) of the NLRA. BAR's fourth cause of action asserts tortious interference with a contract against the Trustees, Wissing, LaBarbera, and Jason Ide, the president of Local 814.[4] The defendants filed motions to dismiss pursuant to Rule 12(b)(6), alleging that BAR failed to sufficiently plead the elements of either a section 8(b)(4) or a tortious interference with contract claim. The defendants' motions are granted in part and denied in part for the reasons that follow.

**DISCUSSION**

A. Standard of Review

1. Rule 12(b)(6)

For a complaint to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In order to plead "facial plausibility," a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard of

---

[4] BAR asks to "voluntarily dismiss its claims against defendants Ide and LaBarbera without prejudice," and argues that the Court need not rule on them. (Mem. in Opp. (Doc. No. 34) at 6.) Because the complaint fails to properly allege that either Ide or LaBarbera was personally involved in tortiously interfering with a contract, BAR's claims against them are dismissed.

4

plausibility does not require the plaintiff to demonstrate "probability," but requires a showing of "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). To that end, the reviewing court "must take all of the factual allegations in the complaint as true," however the court is "not bound to accept as true a[ny] legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

2. Section 303

Section 303 of the LMRA, 29 U.S.C. § 187, provides a private right of action to persons affected by unfair labor practices under section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). *See C&D Restoration, Inc. v. Laborers Local 79*, No. 02-CV-9448, 2004 WL 1878789, at *2 (S.D.N.Y. Aug. 20, 2004).

   a. Section 8(b)(4)(A)

Section 8(b)(4)(A) makes it an unfair labor practice for a union to (i) induce or encourage an employee to cease working for his or her employer, or (ii) threaten, coerce, or restrain any person in an industry affecting commerce, when "'an object thereof is . . . forcing or requiring an employer . . . to enter into any agreement which is prohibited by [section 8(e) of the Act].'" *NLRB v. Local 32B-32J SEIU*, 353 F.3d 197, 198 (2d Cir. 2003) (quoting 29 U.S.C. § 158(b)(4)(A)); *see also Blyer v. Pratt Towers, Inc.*, 124 F. Supp. 2d 136, 144 (E.D.N.Y. 2000) ("A strike by a union to compel an employer to agree to violate section 8(e) constitutes a violation by the union of section 8(b)(4)(ii)(A)."). Section 8(e), in turn, makes it unlawful "for

5

any labor organization and any employer to enter into any . . . agreement, express or implied, whereby such employer ceases . . . or agrees to cease . . . doing business with any other person." 29 U.S.C. § 158(e). It was enacted with the goal of outlawing agreements between unions and employers, regardless of whether the union takes any action to pressure the employer to enter into or abide by such an agreement. *See Carrier Air Conditioning Corp. v. NLRB*, 547 F.2d 1178, 1185 (2d Cir. 1977). "By prohibiting certain secondary activity based on 'express or implied' agreements, section 8(e) intended to close a loophole in section 8(b)(4)(ii)(B) through which unions used 'hot cargo' clauses to 'exert subtle pressures upon employers to engage in 'voluntary' boycotts.'" *Sheet Metal Workers, Local Union No. 91 v. N.L.R.B.*, 905 F.2d 417, 421 (D.C. Cir. 1990) (quoting *Nat'l Woodwork Mfrs. Ass'n*, 386 U.S. 612, 634 (1967)); *see also NLRB v. Hotel & Restaurant Employees and Bartenders' Union Local 531*, 623 F.2d 61, 65 (9th Cir. 1980) ("Section 8(e) aims at contractual provisions . . . [and] prohibits only those provisions establishing secondary union pressures."). In other words, "implied" was inserted to encompass those situations in which employers were "voluntarily" boycotting certain contractors on the basis of pre-existing contractual provisions in agreements they had with unions. Courts have termed such agreements themselves "hot cargo" agreements. *Local 32B-32J*, 353 F.3d at 200.

    b. Section 8(b)(4)(B)

Section 8(b)(4)(B) prohibits labor organizations from (i) inducing or encouraging an employee to cease working for his or her employer, or (ii) threatening, coercing, or restraining any person in an industry affecting commerce, in order "to interfere with the business relationships of employers engaged in commerce[,] for the purpose of causing the employer to cease doing business with any other person." *Allstate Interiors, Inc. v. United Brotherhood of Carpenters and Joiners of America*, No. 10-CV-2861 (RWS), 2010 WL 3894915, at *2

6

(S.D.N.Y. Sept. 10, 2010) (citing 29 U.S.C. § 158(b)(4)(B)). Like section 8(b)(4)(A), section 8(b)(4)(B) generally proscribes only conduct that is deemed "secondary" in nature and exempts that which is "primary." 29 U.S.C. § 158(b)(4)(B); *see also C&D Restoration, Inc. v. Laborers Local 79*, No. 02-CV-9448 (CSH), 2004 WL 736915, at *3 (S.D.N.Y. Apr. 5, 2004) ("[Section] 8(b)(4)(B) proscribes secondary picketing and boycotting."). The Second Circuit has explained the distinction between primary and secondary activity:

> When a union targets an employer with whom it has a dispute, the union is said to have engaged in "primary activity." When a union targets an employer with whom it does not have a dispute (a "secondary" or "neutral employer"), the union is said to have engaged in secondary activity.

*Tru-Art, Inc. v. Local 137 Sheet Metal Workers International Association*, 573 F. App'x 66, 67 n.1 (2d Cir. 2014) (citing *Capitol Awning Co. v. Local 137 Sheet Metal Workers International Association*, 698 F. Supp. 2d 308, 322 (E.D.N.Y. 2010)). By pressuring a secondary employer, a union may succeed in placing enough indirect "pressure on a primary employer . . . [to force] that employer [to] capitulate[] to the union's demands. Such conduct runs counter to the public policy expressed in the NLRA." *C&D Restoration, Inc.*, 2004 WL 736915, at *3.

Notably, "Congress intended by enacting Section 8(e), to supplement and *not* supplant the secondary boycott provisions of the Act which are now designated as Section 8(b)(4)(B)." *Teamsters, Local 282 (General Contractors Association of New York)*, 262 NLRB 528, 547 (1982) (emphasis added). Section 8(b)(4)(B) therefore differs from 8(b)(4)(A) in that the latter requires a specific, already existing agreement or a proposed agreement that violates section 8(e), while 8(b)(4)(B) does not. Instead, a violation of 8(b)(4)(B) only requires that a union cause an employer to cease doing business with a different organization. *See Am. Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 82 (1st Cir. 2008); *Construction, Production & Maintenance*

*Laborers Union, Local 383 v. NLRB*, 323 F.2d 422, 426 (9th Cir. 1963) (noting that the Supreme Court recognizes a "definite" distinction between an agreement to cease doing business and the cessation itself).

        c. Section 8(b)(4)(D)

Section 8(b)(4)(D) makes it an unfair labor practice for a labor organization to (i) induce or encourage an employee to cease working for his or her employer, or (ii) threaten, coerce, or restrain "the employees of any employer to strike[,] in the hopes of forcing an employer to assign particular work to employees in a particular labor organization" rather than the employees of a primary employer with whom the labor organization has a dispute. *C&D Restoration, Inc.*, 2004 WL 736915 at *4 (quoting *Int'l Tel. & Tel. Corp. v. Local 134, International Brotherhood of Electric Workers*, 419 U.S. 428, 430–31 (1975)).

  B. <u>Application</u>

    1. <u>Claims Against Local 814</u>

BAR does not allege that Local 814 took any action that led to AECOM's reassignment of work. The complaint's sole relevant allegation to claims against Local 814 is that "Local 814 encouraged and/or directed the BCTC to have plaintiff barred from the Premises and to have the Landlord reassign [its] work to an alternate contractor." (Compl. at ¶ 42.) This allegation amounts to no more than a conclusory recitation of the statute, and it is therefore not entitled to an "assumption of truth." *Iqbal*, 556 U.S. at 678–79. BAR attempts to substantiate this allegation with a statement that "Preslier spoke with a principal of a Local 814 contractor who told [him] that it had encouraged Local 814 to bring pressure to bear upon the BCTC to take action that would result in [BAR's] removal from the AECOM job." (Compl. at ¶ 43.) However, this attenuated chain of contact still fails to include an allegation that Local 814 *itself*

8

actually took any unlawful action. It states only that a principal of a Local 814 *contractor* told Preslier "that it had encouraged Local 814 to . . . pressure . . . BCTC," (*id.*), but does not allege that *Local 814* ever actually contacted BCTC to encourage or direct it to injure BAR.

BCTC's conduct cannot be imputed to Local 814,[5] and BAR fails to allege that Local 814 actually threatened or coerced anyone, much less that it did so with the object of procuring a "hot cargo" agreement (section 8(b)(4)(A)), a secondary boycott (section 8(b)(4)(B)), or AECOM's reassignment of work (section 8(b)(4)(D)). Each of BAR's claims against Local 814 is therefore dismissed.

  2. Claims Against BCTC[6]

    a. Section 8(b)(4)(i) Claims

BCTC argues that BAR's section 8(b)(4)(i) claims must be dismissed because the complaint fails to allege that BCTC targeted or encouraged employees of AECOM to refuse to perform their duties. The Court agrees. "[C]laims filed under section 8(b)(4)(i) are limited to instances in which a union targets the employees of a secondary employer and encourages those

---

[5] To the extent that BAR seeks to impute BCTC's actions to Local 814 under agency principles, this argument fails as well. BAR's only allegations from which an agency relationship could be inferred are conclusory. Its claims that "Local 814 encouraged and/or directed the BCTC to have plaintiff barred," (Compl. at ¶ 42), and that "BCTC . . . assists Local 814 in its unlawful venture to pressure neutral third parties to cease doing business with BAR," (*id.* at ¶ 46), are insufficient to create a plausible inference that an agency relationship existed here. *See, e.g.*, *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 215 (S.D.N.Y. 2014) ("[A] simple conclusory allegation to the effect that 'defendant A acted as defendant B's agent,' without more, would not plausibly state an agency relationship.").

[6] BCTC contends that it is not a proper defendant because it is not a "labor organization." However, the NLRB has disagreed. *See Electric Workers, IBEW (AFL-CIO) Local 3 (Di Gangi Electrical Services)*, 130 N.L.R.B. 1458, 1459 (1961) ("The Building and Construction Trades Council of Greater New York . . . is a labor organization consisting of delegates from the local unions of the building trades in the area."); *In the Matter of Stiefel Construction Corporation and United Steelworkers of America., C.I.O.*, 64 N.L.R.B. 565, 566 (1945) ("Building and Trades Council of Greater New York . . . is a labor organization admitting to membership employees of the Company."); *National Gypsum Co.*, 32 N.L.R.B. 976, 977 (1941) (describing BCTC as one of many "labor organizations claiming to represent employees directly affected by the investigation"). *See also Beckett v. Atlas Air, Inc.*, 968 F. Supp. 814, 821–22 (E.D.N.Y. 1997) (noting that "[t]he term 'labor organization' was intended to be, and has been, interpreted very broadly under the NLRA"). In any event, BAR has plausibly alleged that BCTC is a labor organization, and any dispute with this allegation is more appropriately dealt with after discovery.

employees to strike or to refuse to perform their duties for that secondary employer." *Capitol Awning Co.*, 698 F. Supp. 2d at 327 (emphasis removed); *see also NLRB v. Servette, Inc.*, 377 U.S. 46, 52–53 (1964) (noting that section 8(b)(4)(i) condemns "union pressures calculated to induce the employees of a secondary employer to withhold services in order to force their employer to cease dealing with the primary employer"). Because the complaint fails to allege that BCTC ever targeted or encouraged any of AECOM's employees, BCTC's motion to dismiss BAR's section 8(b)(4)(i) claims is granted.

      b. Section 8(b)(4)(ii) Claims

           i. Section 8(b)(4)(A)

BCTC also argues that BAR's section 8(b)(4)(A) claim must be dismissed because BAR fails to sufficiently allege that BCTC acted with the goal of securing any unlawful "hot cargo" agreement with AECOM. The Court agrees that the complaint is devoid of any such allegation – that BCTC's communications with Wissing were undertaken for the purposes of causing AECOM to enter into an agreement or to abide by an already existing agreement with BCTC. Where there is no allegation of such an agreement, there can be no violation of section 8(b)(4)(A). *See United Rentals Highway Techs., Inc. v. Ind. Constructors, Inc.*, 518 F.3d 526, 531 (7th Cir. 2008) (dismissing an 8(b)(4)(A) claim because a contractors' refusal to do business with a company "could not have been premised on [a] clause in the collective bargaining agreement"); *Employing Lithographers of Greater Miami, Fla. v. NLRB*, 301 F.2d 20, 30 (5th Cir. 1962) (noting that "Congress has banned agreements whereby an employer refrains or agrees, expressly or impliedly, to refrain from handling the work of another employer," on the basis of a clause in the agreement); *Smart v. International Brotherhood of Electric Workers*, No. 07-CV-94, 2010 WL 1286073, at *6 (S.D. Ill. Mar. 26, 2010) ("Stoecklin's decision to use

Barnett Electric instead of Plaintiff for the electrical work amounts to, at best, acquiescence of an involuntary decision, based on IBEW 702's alleged threats. Therefore, under Section 8(e), there can be no 'contract or agreement' illegally made between IBEW 702 and Stoecklin in order for Plaintiff to attempt to allege a Section 303 claim for wrongful behavior defined in Section 8(b)(4)(A)."). As BAR fails to make any allegation that BCTC attempted to enter into an actual agreement with AECOM or to enforce an already existing agreement with AECOM, BCTC's motion to dismiss the section 8(b)(4)(A) claim is granted.

ii. Section 8(b)(4)(B)

BAR claims that BCTC violated section 8(b)(4)(B) by threatening Wissing as part of an unlawful secondary boycott of AECOM's relationship with BAR. BCTC counters that section 8(b)(4)(ii)(B) does not prohibit a union from informing secondary employers of its intention to picket a primary employer or from picketing the primary employer at a site under the control of a secondary employer. BCTC further contends that BAR's section 8(b)(4)(B) claim must be dismissed because it fails to sufficiently allege either that BCTC actually threatened or coerced Wissing, or that the communications between BCTC and Wissing were undertaken with the goal of forcing AECOM to cease doing business with BAR. The Court disagrees.

BCTC argues that section 8(b)(4)(B) should be construed to provide that a violation is found when a union threatens, coerces or restrains a neutral party with the object of coercing *that* party to cease doing business with the plaintiff. (*See* BCTC Mem. in Supp. (Doc. No. 32) at 9.) As applied, such a construction would require BCTC to threaten or coerce AECOM directly, rather than through Wissing, to violate the provision. But BCTC offers no support for this interpretation, and a plain reading of the statute suggests a different understanding.

11

The statute prohibits unions from threatening, coercing, or restraining "any person" with the goal of forcing "any person" to cease doing business with "any other person." Further, the purpose of section 8(b)(4)(B) is the broad prohibition of unlawful secondary activity. *See International Longshoremen's Association v. Allied Int'l, Inc.*, 456 U.S. 212, 225 (1982) ("The prohibition was drafted broadly to protect neutral parties, 'the helpless victims of quarrels that do not concern them at all.' . . . Recognizing that 'illegal boycotts take many forms,' Congress intended its prohibition to reach broadly." (citations omitted)). Thus it does not matter that BCTC chose to threaten *Wissing* rather than threatening AECOM *directly*, as long as the goal was to induce AECOM to breach its contract. Whether the threat is made directly to the secondary employer or indirectly to a neutral party with the goal of affecting the secondary employer, the object and potential result are the same.

Moreover, BAR plainly alleges that Wissing told Preslier that his statements were "based upon communications he had with the BCTC," and that "Wissing stated that the BCTC had told him not to allow BAR into the building." (Compl. at ¶ 37.) Those allegations are further supported by claims that Wissing refused BAR's entry because it was "not a member of the BCTC," and due to the fear that BCTC would picket the front entrance of the Premises. (*Id.* at ¶ 34.) Such allegations give rise to a plausible inference that Wissing was acting in response to his communication with BCTC.[7] Though it is possible that BCTC merely informed Wissing of its intent to lawfully boycott BAR, the complaint alleges sufficient facts regarding unlawful communications to withstand dismissal at this stage. *See Twombly*, 550 U.S. at 556 ("Asking for

---

[7] BCTC also argues that there are other plausible explanations for Wissing's fear of picketing. But alternative explanations for Wissing's fear are irrelevant. It suffices that BAR has sufficiently pled facts that give rise to an inference that the defendant undertook unlawful conduct. *See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. . . . A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.").

12

plausible grounds to infer [unlawful conduct] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]."). As such, BCTC's motion to dismiss BAR's Section 8(b)(4)(B) claim is denied.

### iii. Section 8(b)(4)(D)

BAR also claims that BCTC violated section 8(b)(4)(D) by threatening or coercing Wissing with the goal of forcing AECOM to assign work to a Local 814 contractor. BCTC argues that BAR alleges only that BCTC (a) made statements to prevent BAR from entering the Premises and (b) publicly declared that Local 814 was the only moving and storage union it recognizes, and that neither statement constitutes a solicitation to reassign AECOM's work.

However, section 8(b)(4)(D) requires only an allegation that the defendant threatened or coerced some person with the goal of forcing a secondary employer "to assign particular work to employees in a particular labor organization." 29 U.S.C. § 158(b)(4)(ii)(D). The facts alleged in this complaint give rise to the inference that the communications between Wissing and BCTC were aimed at getting AECOM to reassign its work to a Local 814 contractor. Those facts include that "Wissing stated to Preslier that his statements were based upon communications he had with the BCTC . . . [who] had told him not to allow BAR into the building," (Compl. at ¶ 37); that "he was 'between the rock and the hard place' . . . [and] had a 'big problem with AECOM,'" (*id.* at ¶ 39); and that "[t]hereafter, AECOM reassigned to a [Local-814 affiliated] moving and storage contractor certain of the work that had been contracted by AECOM to [BAR]," (*id.* at ¶ 41). BCTC's alleged declaration that Local 814 is the only moving and storage union it recognizes, (*see id.* at ¶ 46), lends credence to the inference that the communications in

13

question were made for the purpose of forcing AECOM to reassign work to a Local 814 contractor. BCTC's motion to dismiss BAR's section 8(4)(b)(B) claim is therefore denied.

       3.   <u>State Law Tortious Interference with Contract Claim</u>

In its fourth cause of action, BAR alleges claims of tortious interference with a contract against the Landlord Defendants.[8]

To establish a claim of tortious interference, a plaintiff must show "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (internal quotation marks omitted)). "Plaintiff must [also] . . . allege that the breach would not have occurred 'but for' the conduct of the defendants." *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 279 (E.D.N.Y. 2012) (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)).

There is no dispute that BAR properly alleges three of the five elements: (1) the existence of a contract between BAR and AECOM, (*see* Compl. at ¶ 27); (2) that Wissing knew of the existence of that contract, (*see id.* at ¶¶ 28, 37–39); and (5) that BAR suffered monetary damages, (*see id.* at ¶ 47). The Landlord Defendants contend that the complaint fails to allege (3) intentional procurement of AECOM's breach, and (4) that AECOM actually breached the contract.

---

[8] In their opposition papers, BAR asserts that it wishes to "voluntarily dismiss its claims against defendants Ide and LaBarbera." (Mem. in Opp. (Doc. No. 34) at 6, f.n.1.), the Court considers this claim only against Wissing and the Trustees. Furthermore, as BAR does not assert its state law claim against BCTC, the Court need not address whether the "*Martin* rule" applies. (*See* Doc. No. 32 at 16.)

a. Intentional Procurement of the Breach

"The procurement portion of a claim of tortious interference with contract requires only that 'but for' the conduct of the defendant, there would not have been a breach." *Planet Payment, Inc. v. Nova Info. Sys.*, No. 07-CV-2520 (CBA), 2011 WL 1636921, at *10 (E.D.N.Y. Mar. 31, 2011) (citing *Sharma*, 916 F.2d at 828). In other words, the "defendant must have induced or otherwise caused the third party not to perform the contract." *Id.* (citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007) (quoting Restatement (Second) of Torts § 766 (1979)). The Landlord Defendants note that BAR does not allege any interaction between Wissing and AECOM, and argue that Wissing therefore could not have induced AECOM to breach the contract. (Reply in Supp. (Doc. No. 37) at 5.) The court disagrees.

A defendant can cause the breach of a contract either directly or indirectly. *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 173 (E.D.N.Y. 2010) ("The inducement causing the breach 'may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other.'" (quoting Restatement (Second) of Torts § 766 cmt. k)). Here, BAR alleges that Wissing caused AECOM to breach its contract by prohibiting BAR from entering the building and thereby from performing the contract. It stands to reason that a defendant can cause a breach of a contract by preventing either party from performing that contract. *See* Restatement (Second) of Torts § 766 cmt. k (noting that "[i]nterference with the third party's performance may be by prevention of the performance").

BAR alleges that the Landlord Defendants were "aware that Plaintiff was barred from performing services within the Premises . . . and had sanctioned the prohibition," that Wissing had a "big problem" with AECOM, and that "[t]hereafter, AECOM reassigned [the work] to another moving and storage contractor." (*Id.* at ¶¶ 38–41.) In essence, BAR claims that Wissing

15

prevented it from entering the building and knew that doing so would cause a breach of its contract with AECOM. "[A]n actor intentionally procures a breach of a third party's contract even where the breach 'is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.'" *St. John's Univ.*, 757 F. Supp. 2d at 173 (quoting Restatement (Second) of Torts § 766 cmt. j).

These allegations are sufficient to give rise to the inference that Wissing intended to induce AECOM to reassign its business elsewhere. *See MGR Meats, Inc. v. Schweid*, No. 10-CV-3068 (MKB), 2011 WL 6675123, at *3 (S.D.N.Y. Dec. 21, 2012) ("It is not necessary that a plaintiff use the term 'but for' as long as the complaint sufficiently alleges that the defendant was the cause of the breach."); *Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 187 (S.D.N.Y. 2000) (holding that there was enough in the complaint from which the court could infer that defendant was the "but for" cause of the breach).

      b. <u>Actual Breach</u>

The Landlord Defendants also argue that BAR fails to allege that AECOM's reassignment constituted an actual breach of the contract. Here, the Court agrees.

BAR alleges only that "AECOM reassigned to another moving and storage contractor certain of the work that had been contracted by AECOM to Plaintiff." (Compl. at ¶ 41.) However, BAR did not characterize that reassignment as a breach until the filing of its opposition papers, (*see* Mem. in Opp. at 11). *See Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, No. 13-CV-7307 (AJN), 2014 WL 4804465, at *10 (S.D.N.Y. Sept. 26, 2014) (noting that "it is axiomatic that the [c]omplaint cannot be amended by briefs in opposition to a motion to dismiss" (internal citation and quotation marks omitted)). BAR failed to allege an actual breach in the complaint or any documents referenced within it. *See id.* (finding that plaintiff "fail[ed] to

plausibly state that a breach of the [contract] occurred" where the complaint did not "identify the portions of the [contract] breached by [the defendant]"); *Ellington Credit Fund, Ltd. v. Select Portfolio Serv'g, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (establishing that to sufficiently plead the elements of tortious interference with contract, "plaintiff must identify what provisions of the contract were breached as a result of the acts at issue" (internal quotation marks omitted)); *Orange Cnty. Choppers v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 554 (S.D.N.Y. 2007) (holding that plaintiff's complaint was deficient as a matter of law because it failed to demonstrate actual breach, thereby "leav[ing] open the possibility that [the third party] lawfully terminated the contract or that the contract was at will"); *see also Kirch*, 449 F.3d at 402 (finding that an allegation that third party had "walked away" from project was insufficient to satisfy element of breach). As a result, the Landlord Defendants' motion to dismiss is granted.

### III. CONCLUSION

For the reasons set forth above, BCTC's motion to dismiss is granted with respect to the first cause of action and all claims arising under section 8(b)(4)(i), and denied with respect to the second and third causes of action. The motions of Local 814 and the Landlord Defendants are granted, and all claims are dismissed as against them. All claims against Ide and LaBarbera are dismissed.

This action is re-committed to the assigned Magistrate Judge for purposes of all pre-trial proceedings.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
       March 27, 2015          _____
                               ROSLYNN R. MAUSKOPF
                               United States District Judge